RECEIVED
NOV 2 5 2013
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**ALEXANDRIA DIVISION**

| | |
|---|---|
| **LOUISIANA FARM BUREAU CASUALTY INSURANCE CO., et al.** | **CIVIL ACTION NO. 11-0684** |
| -vs- | **JUDGE DRELL** |
| **THETFORD CORP., et al.** | **MAGISTRATE JUDGE KIRK** |

## RULING

Before the Court is a "Motion for Partial Summary Judgment on Damages" filed by Defendant, Norcold, Inc. ("Norcold"). (Doc. 43). For the following reasons, Defendant's motion will be **GRANTED in PART** and **DENIED in PART**.

I. **Background**

This lawsuit arises from a fire that erupted on May 27, 2010, at the residence of Jerrel and Shirley McNeal (collectively, "the McNeals"). Plaintiffs, Louisiana Farm Bureau Casualty Insurance Co., Louisiana Farm Bureau Mutual Insurance Co. (collectively, "Farm Bureau"), and the McNeals, allege the fire was caused by a defective refrigerator inside a recreational vehicle ("the camper") belonging to the McNeals. At the time of the fire, the McNeals stored the camper, along with other personal property, inside a metal shed constructed by Mr. McNeal ("the building"). (Jerrel McNeal Deposition, Doc. 43-3, Exh. A at pp.

37–39). The fire resulted in substantial damage to the building and property stored therein, and it completely destroyed the camper.

After the fire, the McNeals elected to repair the building themselves. With the help of his neighbor, Monty Brouillette ("Mr. Brouillette"), Mr. McNeal personally demolished and rebuilt the metal garage. The McNeals and Mr. Brouillette also examined the remnants of the building's contents. Mrs. McNeal composed a handwritten list of the destroyed contents ("the list") and used a Grainger catalog to determine the replacement cost of each item on the list. (Memorandum in Support, Doc. 43-2 at p. 3; Jerrel McNeal Deposition, Doc. 43-3, Exh. A at p. 61).[1] Phillip Peck ("Mr. Peck"), a valuation expert, testified that this was a reasonable method for establishing the replacement cost of the ruined items. (Doc. 47-6, Exh. 5 at p. 41).

The post-fire repairs and clean-up efforts took at least six months to complete. (Shirley McNeal Deposition, Doc. 47-4, Exh. 3 at p. 27). During this time, Mr. McNeal allegedly retired from building-erection work with D'Argent Construction, LLC ("D'Argent") and turned down other jobs to complete the restoration. (Jerrel McNeal Deposition, Doc. 43-3, Exh. A at pp. 12, 21–22, 52; D'Argent Letter, Doc. 43-7, Exh. E). Thus, Plaintiffs maintain the McNeals suffered

---

[1] W.W. Grainger, Inc. ("Grainger") is a business-to-business supplier and distributor of maintenance, repair, and operating products. Grainger publishes an annual catalog listing its available retail products and prices.

a loss of income as a result of the fire. (Memorandum in Opposition, Doc. 47 at pp. 11–12).

Pursuant to insurance policies in effect at the time of the fire, Farm Bureau paid the McNeals $76,916 for the resulting losses.[2] The McNeals also claim to have suffered uninsured losses far exceeding their policy limits for damage to the building and its contents. (Complaint, Doc. 1, ¶ II). To evidence their damages, the McNeals obtained an estimate from D'Argent, which values total reconstruction of the building at $132,776.77 ("the estimate"). (Doc. 43-4, Exh. B).[3] In addition, the McNeals provided the list of the various items destroyed in the fire and their replacement values, as well as photographs of those items taken after the fire. (List, Doc. 43-5, Exh. C; Answers to Interrogatories, Doc. 47-7, Exh. 6). The list totals $244,866.05 in ruined property. (List, Doc. 43-5, Exh. C; Memorandum in Support, Doc. 43-2 at p. 8).

---

[2] Louisiana Farm Bureau Mutual Insurance Co. ("Farm Bureau Mutual") issued the policy covering the building and its personal property contents ("the homeowner policy"). According to the policy's terms, the personal property was insured for $55,500, while the building itself was insured for only $11,100, after the McNeals met their $1000 deductible. Plaintiffs allege Farm Bureau Mutual tendered $66,000 for the building and its contents pursuant to this policy. (Complaint, Doc. 1 at ¶ IV; Responses to Request for Production of Documents, Doc. 47-2, Exh. 1). The policy covering the camper ("the automobile policy") was issued by Louisiana Farm Bureau Casualty Insurance Co. ("Farm Bureau Casualty") and imposed a $100 deductible. Farm Bureau Casualty paid the McNeals a sum of $10,916 pursuant to this policy. (Complaint, Doc. 1 at ¶ V). The McNeals do not allege uninsured losses in excess of the automobile policy limit. Their claim for uninsured losses is limited to personal property damages in excess of the homeowner policy limit.

[3] The estimate includes $19,710 for pouring and finishing a concrete slab and $10,000 for clean up and disposal of fire debris.

Plaintiffs filed their original suit for reimbursement in the amount of $76,916, plus their uninsured losses, on April 29, 2011, in the 12th Judicial District Court for the Parish of Avoyelles, Louisiana, naming Thetford Corp. ("Thetford") as defendant. (Doc. 1-3). Thetford subsequently filed a notice of removal on April 29, 2011, relying on diversity jurisdiction. (Doc. 1). On September 2, 2011, Plaintiffs amended their complaint more fully to identify Norcold, the manufacturer of the allegedly defective refrigerator, as the proper defendant. (Doc. 13).

Norcold filed the present "Motion for Partial Summary Judgment on Damages" on September 10, 2013, seeking dismissal of Plaintiffs' claims for property damages and loss of income. (Doc. 43). However, this motion was filed before Farm Bureau agreed to a settlement with Norcold. Upon joint motion by the parties (Doc. 49), we subsequently dismissed all claims by Farm Bureau against Norcold with prejudice and with the McNeals reserving any rights they may have against Norcold (Doc. 50). Therefore, the only claims remaining in the instant motion for partial summary judgment are the McNeals' claims for property damages and loss of income.

Norcold's argument is three-fold: (1) There is no genuine dispute of material fact that the McNeals restored the building to its original condition before the fire and therefore are precluded from recovering the total replacement cost reflected in the estimate; (2) there is no genuine dispute of material fact that the McNeals

cannot prove their actual expenses in repairing the building or their personal property damages; and (3) there is no genuine dispute of material fact that Mr. McNeal was retired at the time of the fire and therefore could not have suffered a loss of income. Plaintiffs have opposed the motion (Doc. 47) to which opposition Defendant has replied (Doc. 48). After carefully reviewing the submissions of the parties, the Court rules as follows:

II. **Law and Analysis**

    A. **Motion for Summary Judgment**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We consider all "evidence in the light most favorable to the party resisting the motion." Trevino v. Celanese Corp., 701 F.2d 397, 407 (5th Cir. 1983). It is important to note that the standard for a summary judgment is two-fold: (1) there is no genuine dispute as to any material fact, *and* (2) the movant is entitled to judgment as a matter of law.

    B. **Property Damages**

The damaging of another's property obliges the responsible party to repair any damages caused by his legal fault or neglect. La. Civ. Code art. 2315; Roman

Catholic Church of the Archdiocese of New Orleans v. La. Gas Serv. Co., 618 So.2d 874, 876 (La. 1993) (hereinafter, "Roman Catholic Church"). The injured plaintiff is entitled to full indemnification from the defendant, who must return the plaintiff to the same position he would have enjoyed "if the injury complained of had not been inflicted on him." Roman Catholic Church, 618 So.2d at 876. (citing Coleman v. Victor, 326 So.2d 344, 346 (La. 1976)). Accordingly, "when property is damaged through the legal fault of another, the primary goal is to restore the property as nearly as possible to the state it was in immediately preceding the damage." Id. (quoting Coleman, 326 So.2d at 346).

In determining the appropriate measure of damages, the Louisiana Supreme Court has held:

> [A]s a general rule of thumb, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, or, at his election, the difference between the value of the property before and after the harm.

Id. at 879. However, when "the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful," the only measure of damages is "the difference between the value of the property before and after the harm," unless the owner has a personal reason for restoring the property's original condition, or "a reason to believe that the plaintiff will, in fact, make the repairs." Id. at 879–80. Louisiana courts have devised a third test—"the cost of replacement, less reasonable depreciation"—for calculating

property damages when "the value before and after the damage cannot be reasonably determined" or the property is "damaged beyond repair." Brown v. Williams, 850 So.2d 1116, 1124 (La. App. 2d Cir. 7/31/03).

### 1.   *Damage to Metal Building*

As a preliminary matter, we note that neither party has produced evidence regarding the difference in value of the metal building before and after the fire. Therefore, in arriving at an adequate measure of damages, we cannot rely on the value differential test explained above.

Norcold first argues that the proper measure of damage to the building is the actual cost of restoration or repair. Norcold further contends that the McNeals cannot recover the estimated replacement cost, as a matter of law, because they chose to repair the building and had conducted repairs prior to filing the instant suit. In Roman Catholic Church, the Louisiana Supreme Court reversed a district court's award of replacement cost less depreciation when a damaged building had been repaired by the time of trial. 618 So.2d at 879–80. The supreme court measured plaintiff's property damage award by the total cost of restoring the building to its original condition, even though plaintiff's repair costs exceeded the building's market value before the fire. Id. at 880. The court concluded: "[T]he plaintiff in the present case is clearly entitled to recover the full cost of restoration because it has, in fact, made the repairs by replacing the building in its original condition." Id.

7

We find no genuine dispute that the McNeals elected to repair the building themselves, or that building repairs have been made at this time. In his deposition, Mr. McNeal admitted he "demolished" and "rebuilt" the building after the fire. (Doc. 43-3, Exh. A at p. 42). Likewise, Mrs. McNeal confirmed that the couple spent the entire summer after the fire clearing debris and rebuilding the shed. (Doc. 47-4, Exh. 3 at p. 27). Considering these facts, we agree with Norcold that restoration cost is the appropriate measure of damages.

Moreover, we reject the McNeals' contention that the building was not repaired to its pre-fire quality, thus warranting a greater award of replacement costs. The McNeals personally undertook building repairs, presumably with the understanding that the building was capable of restoration to its original condition. In repairing the building, Mr. McNeal reused parts of the original foundation, even though they were "bent and warped", "burnt", or "cracked." (Jerrel McNeal Deposition. Doc. 43-3, Exh. A at pp. 42, 44–45). Additionally, the McNeals modified the original layout of the building during the restoration process to accommodate their current needs.[4] Based on the undisputed facts, the McNeals made an affirmative decision to repair the building and maintained total control over the method and quality of those repairs. Accordingly, Norcold is entitled to

---

[4] In her deposition, Mrs. McNeal admitted to changing the building layout during the repairs:
    Q: And does [the building] still have that same [pre-fire] configuration?
    A: No. We narrowed down where the camper was, because [Mr. McNeal] didn't want to park [the] camper underneath that garage, so he closed that part off.
(Doc. 47-4, Exh. 3 at pp. 20–21).

judgment as a matter of law that Plaintiffs' building damage claim is limited to the actual cost of repair.

Next, Norcold contends that the McNeals' building damage claim should be dismissed because they have produced no proof of their out-of-pocket repair expenses, apart from an estimate of $132,776.77 for *replacement* of the building. Louisiana courts have accepted estimates as evidence of a plaintiff's repair costs, but only in cases where the damaged property was not repaired at the time of trial. Foshee v. McGee, 87 So.2d 754, 756 (La. App. 2d Cir. 5/21/56). In Foshee, a Louisiana appellate court disregarded the plaintiff's estimates and awarded damages in the amount of his actual repair costs because his truck had been repaired by the time of trial. Id. The court held: "[T]he automobile was actually repaired and plaintiff can recover no more [than] the cost thereof necessary to restore the property to its condition previous to the collision." Id.

The facts in the instant case are akin to those in Foshee, except that Foshee involved a vehicle, and we agree it is proper to refuse to accept the McNeals' *estimate* as proper evidence of their actual repair costs. Here, the estimate submitted by Plaintiffs calculates the cost of replacing the entire building and accounts for repairs the McNeals did not undertake. For example, the estimate includes $19,710 for the pouring and finishing of a new cement slab. However, there is no genuine dispute that Mr. McNeal chose to use the original slab, as the damage to the slab was merely cosmetic. (Jerrel McNeal Deposition, Doc. 43-3,

Exh. A at pp. 44–45). As discussed above, the metal building has been repaired, and the McNeals can recover no more than the actual cost thereof. The McNeals are therefore precluded, as a matter of law, from recovering damages for replacement of the slab. Norcold's motion for summary judgment will be **GRANTED** insofar as it relates to the McNeals' claim for the value of the slab.

However, we do find a genuine dispute of material fact regarding the value of the McNeals' building damages claim, less the cost of the slab. Neither Plaintiffs nor Defendant has presented evidence that would enable us to determine the value of the McNeals' actual repair expenses at this time. Mr. McNeal testified that he could produce receipts for the materials he purchased to rebuild the shed, but we do not have a copy of these receipts in the court record. (Doc. 43-3, Exh. A at pp. 43–44). Furthermore, the record lacks evidence concerning the value of the McNeals' labor or repair work. Because the amount of actual expenses remains to be fixed, Norcold's motion for summary judgment will be **DENIED** as to the McNeals' claim for building damages, less the cost of the slab.

  2. *Damage to Personal Property Contents of the Building*

Norcold also argues that Plaintiffs cannot produce credible evidence to establish their alleged personal property losses. Norcold suggests that Plaintiffs must produce receipts, expert testimony, or other similar evidence regarding the pre-fire condition and value of the ruined property to avoid summary judgment. Alternatively, Norcold seeks judgment as a matter of law that the proper measure

of the McNeals' personal property damages is fair market value, rather than replacement value. (Memorandum in Support, Doc. 43-1 at pp. 9–10; Reply, Doc. 48 at pp. 6–7).

In support of its argument, Norcold relies on <u>Woodfield v. Dugas</u>, 450 So.2d 1011 (La. App. 1st Cir. 5/30/84), for the proposition that the McNeals cannot sustain their burden of proof by relying on a list and photographs of damaged property. In <u>Woodfield</u>, the plaintiff prepared an inventory of damaged items and their estimated values to substantiate her losses after a vehicle crashed into her house. <u>Id.</u> at 1013. She also produced photographs illustrating the "disarray in which her belongings were found following the accident." <u>Id.</u> However, the district court did not allow recovery for some substantial items of damage because the plaintiff "failed to carry the burden of proving the market values of her losses." <u>Id.</u> In upholding this decision, the appellate court highlighted the insufficiency of the plaintiff's evidence:

> Plaintiff's only evidence to substantiate her losses consists of her own testimony, an inventory of the damaged property together with the approximate values thereof, and photographs of the contents of her home. The inventory, however, was prepared by plaintiff and reflected hearsay evidence as to the value of the goods. Plaintiff called neither an appraiser nor witnesses to verify the information she supplied. Furthermore, plaintiff's photographs did not depict individual damaged pieces of furniture, but merely illustrated the disarray in which her belonging were found following the accident.

<u>Id.</u>

The court in Brown v. Williams, 850 So.2d at 1125, on the other hand, found the same type of evidence more than sufficient to justify an award for the complete loss of plaintiff's property, and rejected the notion that expert testimony is necessary to establish personal property damages. Similar to the case at hand, the Brown plaintiff submitted an extensive list of the damaged contents of her home and the estimated purchase price of those contents. Id. at 1124–25. The district court awarded damages for the lost contents after considering the list and the plaintiff's testimony regarding her ownership of the listed goods. Id. at 1125. However, like Norcold in the instant case, the Brown defendants challenged the property damage award because "the plaintiff failed to offer evidence of the actual value of her house and contents at the time of the damage." Id. at 1124. The appellate court rejected defendants' argument and affirmed the damage award. Id. at 1125. As to the proper measure of damages, the court held that replacement cost less depreciation is the appropriate standard when property is damaged beyond repair and its fair market value at the time of the accident cannot be determined. Id. at 1124. Moreover, the court ruled that the factfinder has broad discretion to weigh the sufficiency of the evidence and to make reasonable inferences in fixing the amount of a property damage award. Id. at 1124–25.[5]

---

[5] "In making an award for the lost contents, the trial court weighed the testimony, considered the extensive list of plaintiff's property and applied a depreciation factor. The trial court was able to make reasonable inferences from the evidence presented to determine the replacement cost of the plaintiff's contents and to reasonably depreciate that amount." Id. at 1125.

The record in this case contains the following evidence, in addition to the aforementioned list, to substantiate the McNeals' personal property damages: (1) photographs of individual items of property destroyed in the fire; (2) a transcript of Mr. McNeal's interview with a Farm Bureau adjuster, in which he describes generally the personal items destroyed in the fire; (3) the deposition testimony of Mr. McNeal, in which he discusses the method used to compile the list; (4) the deposition testimony of Mrs. McNeal regarding her preparation of the list; and (5) the deposition testimony of Mr. Peck, in which he describes their method for determining the replacement cost of the listed items as "reasonable." This evidence creates, we think, a genuine dispute of material fact as to the McNeals' personal property losses and is sufficient to withstand the instant motion. Moreover, as the Brown court noted, it is within the factfinder's discretion to weigh the testimony, to consider the extensive list of damaged property, and to make inferences from the evidence in fixing the amount of damages. However, we are not permitted to make inferences or credibility evaluations at the summary judgment stage. Accordingly, Norcold's motion for summary judgment will be **DENIED** as to this claim.

C. **Loss of Income**

Finally, the McNeals allege they suffered a loss of income as a result of the fire. Mr. McNeal testified that he spent approximately six months clearing fire debris and rebuilding the shed, which prevented him from accepting construction

jobs. (Doc. 47-5, Exh. 4 at pp. 59–60). Likewise, Gary Archer ("Mr. Archer"), a D'Argent representative, testified as follows:

> Q: What was it that gave you the idea that [Mr. McNeal] couldn't work for you anymore as a result of the fire?
> A: He said he couldn't. His words.
> * * * *
> Q: You don't recall specifically whether Mr. [McNeal] ever told you he couldn't do work because he lost his tools?
> A: In the beginning, the first couple, I remember he couldn't because he was too busy trying to rebuild his shop and cleaning it up.

(Doc. 47-3, Exh. 2 at p. 11–12). Mr. Archer further testified that Mr. McNeal had performed construction work for D'Argent in May, prior to the fire, though he could not recall when Mr. McNeal said he was no longer going to work for D'Argent. (Archer Deposition, Doc. 47-3, Exh. 2 at pp. 12, 28–29).

In addition to this testimony, the McNeals reference a letter from Mr. Archer to Mr. McNeal listing the construction projects D'Argent commenced during the six-month period after the fire. The letter states: "Since these are all in your area of operation it is reasonable to expect [you] would have been involved in the majority of them if not all." (Doc. 47-3, Exh. E). However, Norcold contends that Mr. McNeal was retired at the time of the fire and thus could not have suffered a loss of income.

Indeed, the record contains conflicting evidence regarding the timing of Mr. McNeal's retirement. In a recorded interview on June 2, 2010—less than one week after the fire—Mr. McNeal acknowledged he was a cattle farmer and had retired

14

from "putting up metal buildings and doing construction work, back-hoe and dozer work." (Doc. 43-8, Exh. F at p. 2). In his subsequent deposition, Mr. McNeal said he made the decision to quit working within about five days of the fire because he "was disgusted" and had "lost courage."[6] Yet, when asked directly whether he was "alleging that he lost income as a result of this fire," Mr. McNeal responded: "Well, if the building would not have burnt, I would have still stayed there - - but after the building burnt, me and my wife . . . both went in the hospital. We - - I had an anxiety attack, and she had a heart attack, so I quit . . . I didn't do no more work." (Doc. 43-3, Exh. A at pp. 21–22). He estimated that these medical issues arose at least a month after the fire. Based on this evidence, we do find a genuine dispute of material fact concerning the timing of Mr. McNeal's retirement.

We also find a genuine dispute of material fact concerning the justification for Mr. McNeal's retirement and whether his purported loss of income was a result of the fire. In his deposition, Mr. McNeal cited two different reasons for his

---

[6] Mr. McNeal testified as follows:
   Q: Do you recall telling [the interviewer] that you were retired?
   A: Yes sir. I was retired. I was going to retired [sic]. I don't know how I stated it, but . . .
   Q: So, in a matter of five days after the fire you had decided that you were not going to work anymore?
   A: More or less. I was that disgusted, yes, sir.
   * * * *
   Q: . . . but what I don't understand is why that would keep you from going back to work?
   A: I lost courage. That's all I know.
(Doc. 43-3, Exh. A at p. 52).

decision to retire: (1) his disgust and loss of courage and (2) the couple's health problems. However, Mrs. McNeal testified that her doctors did not attribute her heart attack or bypass surgery to the fire. Moreover, the McNeals both admitted they did not seek psychological counseling as a result of the fire. (Jerrel McNeal Deposition, Doc. 43-3, Exh. 1 at p. 52–53; Shirley McNeal Deposition, Doc. 47-4, Exh. 3 at p. 19). Accordingly, Norcold's motion for summary judgment will be **DENIED** as to the loss of income claim.

### III. Conclusion

For the foregoing reasons, Norcold's "Motion for Partial Summary Judgment on Damages" (Doc. 43) will be **GRANTED in PART** to the extent that the appropriate measure of Plaintiffs' building damages claim is Plaintiffs' actual repair costs.

Moreover, we find there is no genuine dispute of material fact that the McNeals did not replace the cement slab, therefore they cannot recover the value of the slab as a matter of law. Accordingly, Norcold's motion will be **GRANTED in PART** insofar as it relates to the McNeals' recovery for replacement of the cement slab.

However, Norcold's motion (Doc. 43) will be **DENIED in PART** as to the McNeals' remaining claims for building damages, less the cost of the slab; personal property damages; and loss of income. Disposition will enter by a separate judgment signed on this date.

SIGNED on this 22ND day of November, 2013 at Alexandria, Louisiana.

DEE D. DRELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT